174 So.2d 229 (1965)
RIVERSIDE REALTY COMPANY, Inc.
v.
NATIONAL FOOD STORES OF LOUISIANA, INC. and National Tea Company.
No. 1793.
Court of Appeal of Louisiana, Fourth Circuit.
April 5, 1965.
Rehearing Denied May 3, 1965.
Writ Refused June 11, 1965.
*230 Deutsch, Kerrigan & Stiles, Ralph L. Kaskell, Jr., and John F. Tooley, Jr., New Orleans, for plaintiff-appellant.
Guste, Barnett & Little, William M. Barnett, New Orleans, for defendants-appellees.
Before REGAN, YARRUT and HALL, JJ.
YARRUT, Judge.
This appeal was taken by Plaintiff, and answered only by Defendant (National Food), from a judgment of the district court rejecting Plaintiff's main demand, and Defendant's (National Food) reconventional demand; both growing out of an alleged breach of a lease between Plaintiff (as lessor) and Defendant, National Food (as lessee). National Tea was made Codefendant as indemnitor of National Food.
Plaintiff, referred to hereinafter as "Riverside," built a suburban shopping center in New Orleans, in the area bounded by Florida Avenue, Desire, Industry and Louisa Streets, adjacent to a Negro public housing project.
National Food, referred to hereinafter as "National," leased an area in the shopping center for eight years, at a minimum monthly rent of $875.00, plus 1% of annual gross profits in excess of $1,050,000.00, not to exceed a total annual rental of $14,000.00.
After operating the supermarket at great loss, National advised Riverside it would close the market, and did so fourteen months thereafter, but continued to use the premises for storage purposes only and regularly paid Riverside the minimum monthly rent of $875.00 until the termination of the lease.
Riverside claims $188,508.00, plus 5% interest, as damages from both Defendants, in solido, for National's alleged breach of the lease in not continuing to operate the supermarket continuously for the entire eight-year term of the lease, as follows:

1. Guaranteed monthly rental
 of $875.00 for 47 months
 unexpired portion of the
 lease (which National subsequently
 paid). $ 41,125.00
2. Loss of estimated additional
 rent which Riverside
 would have received as its
 1% of the gross profits if
 National had been successful. 14,800.00
3. Loss of rents for those portions
 of premises that
 could not be rented because
 of National's abandonment
 of its operation. 132,583.00
 ___________
 Total $188,508.00

In the alternative, Riverside claims the same amount of damages, $188,508.00, itemized as follows: $41,125.00 for rent until the end of the fixed term of the lease, and $147,383.00 for depreciation of Riverside's property and the loss of tenants for the shopping center.
Both Defendants denied any liability to Riverside, and National alone reconvened to recover from Riverside $118,894.00 damages which represented a loss of $2,000.00 because of Riverside's failure to enforce National's exclusive rights to sell groceries in the shopping center; rent of $58,625.00 paid for the remainder of the term, after National vacated; and operational losses of *231 $58,269.00 sustained during the sixteen months National operated, resulting from: (1) the wrongful, false and misleading representations and bad faith of Riverside and its predecessor Desire Development Corporation; (2) failure to complete and lease the major portion of the new shopping center except to small insubstantial neighborhood-type and borderline operations, which required only a minimum of space to operate.
In dismissing both the original demand of Riverside, and the reconventional demand of National, the district court gave written reasons, viz:
"The doctrine of implied obligations is stated in the Civil Code Art. 1903:
"`The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect.'
"As to its application in the present case see Selber Bros. v. Newstadt's Shoe Stores, 194 La. 654, 194 So. 579. Same case 203 La. 316, 14 So. (2d) 10.
"It is the opinion of the Court that the defendant was required to conduct its operations in plaintiff's premises for the mutual benefit of the shopping center and the parties to the contract. The operations to be conducted in a manner consistent with good business principles. The implied obligation of the lease demanded this; and plaintiff was entitled to and did rely on a performance of that kind.
"The Court finds as a fact that the defendant for a period of 16 months conducted its business in a manner consistent with good business principles. Further, that during this period defendant suffered grave financial losses and closed its operations on the lease premises. In short, the defendant acted in good faith.
"The fact that the defendant's store was a financial failure was not due to any fault on the part of the defendant. The failure was due to the location of the Shopping Center and the economic condition of the neighborhood.
"It is admitted that the guaranteed monthly rental of $875.00 has been paid for the 8 years of the lease.
"The evidence conclusively shows that the cessation of operations by the defendant in no wise effected the decision of Morgan & Lindsay, Butler Bros., Woolworth and Handelman. See testimony of Messrs T. J. Mankin, A. E. Hamilton, J. A. Halloran, and Maurice Handelman.
"The only issue is what damages has plaintiff proved?
"The Court is of the opinion that the answer to the above question is NONE."
The two issues here, since National has not briefed or argued its reconventional demand, which we consider has been abandoned, are:
1. Was National obligated to operate its supermarket during the full term of the lease; and,
2. If so, what recoverable damage did Riverside suffer from National's closing of its supermarket.
The lease contains no specific mandatory requirement that National must continuously operate the supermarket for the entire term of the lease. In fact, the lease itself negatives this contention in giving National the right to sublet without Riverside's consent. The only obligation of National was the payment of rent and responsibility for the other specific obligations of the lease. Riverside's theme is that National's obligation *232 to continuously operate for the entire term is implied from a custom and practice governing tenants in shopping centers. This is completely refuted by the fact that a prior lease which Capitol Food Stores (later merged with National) had with the predecessor of Riverside, with only a few months to go, was cancelled in view of the new lease between Riverside and National. The Capitol lease specifically contained a "continuous operation" clause. As was testified by Mr. Tessier, Riverside's real estate agent, other leases which Riverside made with other tenants in the shopping center contained the "continuous operation" clause. Mr. Tessier also testified that the failure of the shopping center to develop was due largely to Riverside's failure to properly complete and promote the shopping center to attract tenants and customers.
Riverside and National were represented by experienced and astute businessmen in their respective fields and by competent counsel, and were dealing at arm's length. Each considered the shopping center with reference to its own interest. Riverside, though it claims to have invested $700,000.00 to build the shopping center, did not do so for the benefit of National, which had no share in the profits or rent from other tenants, and got no concession in its own rent. Briefly, two business concerns, with experienced management, guessed wrong regarding the shopping center.
In the absence of ex contractu obligations, the lessee is bound only by the provisions of LSA-C.C. arts. 2710-2711.
"1. To enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease.
"2. To pay the rent at the terms agreed on." Art. 2710.
"If the lessee makes another use of the thing than that for which it was intended, and if any loss is thereby sustained by the lessor, the latter may obtain the dissolution of the lease.
"The lessee, in that case, shall be bound to pay the rent, until the thing is again leased out; and the lessee is also liable for all the losses which the owner may have sustained through his misconduct." Art. 2711.
Except as provided in LSA-C.C. arts. 2668-2744, the contract of lease is governed by the same rules as are conventional obligations.
The lessor, like the vendor, must explain himself clearly respecting lessee's obligations, and any obscure or ambiguous clause is construed against him. Uniola Real Estate Co. v. Levy Mattress Co., Orl.App. No. 8151; Rosenthal v. Prutsman, Orl.App. No. 8392; see LSA-C.C. art. 2668. The lessor and lessee must abide by the agreement as entered into at the time of the lease. Jackson Brewing Co. v. Wagner, 117 La. 875, 42 So. 356.
Any doubt regarding intentions of parties to a lease, arising from uncertain terms of the contract, will be construed in favor of lessee. Boh v. Pan-American Petroleum Corp., D.C., 37 F.Supp. 785, reversed on other grounds, 5 Cir., 128 F.2d 864.
The trial judge was correct in holding that National was guilty of no wrongdoing or negligence that made their operation a failure after sixteen months. Other national chain store operators, including Woolworth and Morgan & Lindsay, rejected the shopping center as a bad venture. Further, National suffered continued shoplifting losses, destruction of its property by vandals, and other incidents that most assuredly had an adverse effect on patronage. Furthermore, Riverside was derelict in failing to complete the shopping center, most of which remained incomplete, and necessarily unrented.
*233 Had Riverside intended a "continuous operation" by National, it should have insisted on its inclusion in the lease and given National a chance to accept or reject the lease.
Riverside relies on Selber Bros., Inc. v. Newstadt's Shoe Stores, 194 La. 654, 194 So. 579; Id., 203 La. 316, 14 So.2d 10; Rials v. Davis, 212 La. 161, 31 So.2d 726; LSA-C.C. art. 2710 and Boh v. Pan-American Petroleum Corp., supra.
The Selber and Rials cases, supra, are principally to the effect that, where a tenant, in a commercial building, diverts the business to another of its outlets for its own benefit, to the detriment of its lessor, it is responsible for any damages suffered by the lessor.
In the Selber case, the lessee not only ceased operation on the leased premises, but diverted the high-quality business to another of its outlets and turned the leased premises into a cheaper operation before closing up completely. In its opinion the court made this significant comment apropos this case:
"Of course, it was not encumbent upon the defendant to suffer a large financial loss, if such would result by continuous and regular operations in the premises until the expiration of the lease, merely for the sake of providing plaintiff with its customary rentals. * * *"
In the case of Rials v. Davis, supra, the situation was basically the same as in the Selber case. There the lessee received a drycleaning business which lessor had successfully operated for many years prior to the lessee taking over. Lessee reduced the business from a 20-employee operation, to a one-employee operation, with a corresponding decrease in sales and income; and diverted the business to a nearby operation of its own. The lessee was held to have acted in bad faith, in that he failed to act as a prudent administrator of the established business leased to him, for which he was held answerable in damages.
In Boh v. Pan American Petroleum Corp., 128 F.2d 864 (5th Cir.), the lessee attempted to expand the use of the premises "leased * * * `for the purpose of operating thereon a service station * * * and other incidental commercial activity,'" by installing a billboard on the premises advertising services totally unrelated to the business of a service station. The court enjoined the use of billboards advertising products alien to a service station, as not incidental to the operation of service stations, since the lease stipulated the premises were to be used exclusively as a service station and for its related products. That case did not involve a non-use of the premises for a valid reason, but the attempted misuse thereof.
Assuming, arguendo, that National was obligated to "continous operation," what damage did Riverside suffer? The answer, as found by the district court, is "none." In this case National paid the fixed monthly rent as it accrued. Riverside made no attempt to lease to any other tenant, but stood by and accepted the minimum rent without protest. Riverside would not have received the additional 1% of gross sales in excess of $1,500,000, because the supermarket was a total loss.
Regarding the reconventional demand of National, the lower court was correct in rejecting it because Riverside was no more responsible for National's inability to operate successfully than National was responsible for Riverside's bad investment. Moreover, National has apparently abandoned its reconventional demand.
Accordingly, the judgment of the district court is affirmed; both parties to pay their own taxable costs in both courts.
Judgment affirmed.